Michael P. Mora (Ill. Bar No. 6199875)
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-9528
Washington, D.C. 20580
(202) 326-3373 (tel.)
(202) 326-3197 (fax)
E-Mail: mmora@ftc.gov

Stacy R. Procter (CA Bar No. 221078) (Local Counsel)
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4300, x4343 (tel.)
(310) 824-4380 (fax)
Email: sprocter@ftc.gov

Attorneys for Federal Trade Commission

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

| | |
|---|---|
| **In re: ERIC WEST,**<br>**and**<br>**KAY WEST,**<br>Debtors. | Case No. 2:18−bk−21368−BR<br>Chapter 7 |
| **FEDERAL TRADE COMMISSION,**<br>Plaintiff,<br>**v.**<br><br>**ERIC WEST and KAY WEST,**<br>Defendants. | Adv. No. |

## COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF DEBT

Plaintiff Federal Trade Commission ("FTC" or "Commission") brings this adversary proceeding pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (c), for an order determining that a judgment the FTC obtained against Defendants in a prior action is excepted from discharge.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 523. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(I). Plaintiff consents to entry of final orders or judgment in this Adversary Proceeding by the Court.

2. Venue in the Central District of California is proper under 28 U.S.C. § 1409(a).

3. This Adversary Proceeding relates to *In re Eric West and Kay West*, No. 2:18-bk-21368-BR, now pending in this Court ("Bankruptcy Case"). The FTC is a creditor in the Bankruptcy Case pursuant to a stipulated judgment entered against Defendants in *FTC v. Good EBusiness, LLC et al*., LACV-16-1048- ODW-JPR (C.D. Cal.) ("Prior Action"), for deceptively marketing mortgage assistance relief services ("MARS") and student loan debt relief services. Order for Permanent Injunction and Final Judgment as to Defendants Tobias and Komal West ("Final Judgment"), DCt Doc. 46, May 13, 2016, FTC Exhibit A.

**THE PARTIES**

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces: Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce; the MARS Rule, 12 C.F.R. Part 1015; and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, all of which were the basis of the Commission's charges against Defendants in the Prior Action.

5. The FTC brings actions in federal district courts to enjoin violations of the statutes and regulations it administers and obtain equitable monetary relief, including restitution and disgorgement of unlawfully obtained monies. 15 U.S.C. § 53(b).

6. Defendants Eric West, aka Tobias West, and Kay West, aka Komal West, are the Debtors in the Bankruptcy Case pending before this Court.

7. Defendants' corporate codefendants in the Prior Action were: Good EBusiness, LLC ("GEB"), dba The AAP Firm, Student Loan Help Direct and Select Student Loan; Select Student Loan Help, LLC ("SSLH"); and Select Document Preparation, Inc. ("SDP").

8. Defendants owned and controlled their corporate codefendants. Eric West was the sole owner and managing member of GEB, co-owned SSLH with his wife Kay West, and was a director of SDP. Kay West was Chief Operating Officer of GEB, co-owned SSLH with her husband Eric West, and was the majority owner and an officer of SDP.

9. At all material times, acting alone or in concert with others, Defendants formulated, directed, controlled, had the authority to control, or participated in (a) the deceptive MARS scheme, through GEB, and (b) the deceptive student loan debt relief services scheme, through GEB, SSLH, and SDP.

## PRIOR PROCEEDINGS

10. The FTC brought the Prior Action against the Defendants and their codefendants in February 2016, and filed an Amended Complaint in March 2016. Amended Complaint, DCt Doc. 31, FTC Exhibit B.

11. The District Court entered an immediate temporary restraining order against Defendants and appointed a receiver for their corporate co-defendants, DCt Doc. 12 (Feb. 16, 2016), and later entered a preliminary injunction. DCt Docs. 26-27 (Feb. 29, 2016).

12. On May 13, 2016, the District Court entered the stipulated Final Judgment of $2,329,456 against Defendants in the Prior Action. Final Judgment Section V.A. Enforcement of the money judgment is conditionally suspended as set forth in Sections V.B, V.C, and V.D of the Final Judgment.

13. Pursuant to the Final Judgment, for purposes of a nondischargeability proceeding in any subsequent bankruptcy case, Defendants stipulated to all of the facts alleged by the FTC in its Amended Complaint in the Prior Action. Defendants further stipulated that the facts meet all elements of the 11 U.S.C. § 523(a)(2)(A) exception to discharge, and that the Final Judgment has collateral estoppel effect for such purposes. Final Judgment Sections VI.B, VI.C.

## DEFENDANTS' FRAUDULENT CONDUCT GIVING RISE TO THE NONDISCHARGEABLE JUDGMENT DEBT

### I. Defendants' Deceptive MARS Scheme

14. The federal government's "Making Home Affordable" program, which ended in 2016, was a plan to stabilize the U.S. housing market and help financially distressed consumers reduce their monthly mortgage payments to more affordable levels. The Making Home Affordable program included the Home Affordable Modification Program ("HAMP"), in which the federal government committed up to $75 billion to keep consumers in their homes by preventing

foreclosures. Defendants and GEB were not connected with the Making Home Affordable program nor was their MARS program otherwise associated with, or endorsed, sponsored, or approved by, the United States government in any way. The HAMP program was available to eligible borrowers at no cost.

15. From at least January 2014 to August 2014, Defendants and GEB engaged in a course of conduct to market and sell MARS, including home loan modification services.

16. Defendants and GEB marketed their services primarily via unsolicited outbound telemarketing calls and inbound telemarketing calls from consumers responding to online advertising at their website, www.american-apc.com, and direct mail advertising touting foreclosure avoidance.

17. Many of the customers of Defendants and GEB were financially distressed homeowners. Defendants and GEB promised consumers that they would lower the consumer's monthly mortgage payment, mortgage interest rate, or obtain loan forbearance, a loan modification, or other loan restructuring.

18. Defendants and GEB purported to be a law firm and to provide consumers with legal representation through a network of affiliated legal service providers. Defendants and GEB claimed they would provide forensic loan audits and other services that would identify errors in consumers' mortgage loan documents, ferret out predatory lending practices, gather information that they would purportedly use to defend against foreclosure, and win concessions from lenders.

19. Defendants and GEB charged an initial up-front fee, ranging from $1000 to $5000. Defendants and GEB represented that, if they were unable to secure the promised MARS, they would fully refund all fees paid by the consumers.

20. In numerous instances, Defendants and GEB failed to obtain the promised relief for their customers and did not provide promised refunds.

21. Defendants and GEB initiated contact with consumers through unsolicited outbound telemarketing calls and inbound telephone calls from consumers responding to claims on their website touting foreclosure avoidance. The website did not include any of the disclosures required by the MARS Rule.

22. Defendants' and GEB's website claimed the following:

> **DEFENDING AMERICAN HOMEOWNERS**
>
> The AAP Firm & Associates is in the business of helping people that are trapped in their mortgages to continue to live the American Dream of home ownership.
>
> We are a diverse team of experts and attorneys with experience in loan modification, loss mitigation, real estate, and mortgage lending.
>
> Members of our staff have experience working within loss mitigation departments of major U.S. lenders and services. We have helped homeowners across the country secure a loan modification, which enabled them to stay in their homes.
>
> The AAP Firm & Associates provides you with the evidence and support you can trust to help you seek better modification terms, restructuring of new terms, principal or rate reduction, or continued discovery (sic). With the greatest potential to alleviate "normal modification" setbacks and re-occurrence of default, qualified and objective evidence helps simplify negotiations and stay using the information and support provided by National Forensic Loan Auditors.

23. In numerous instances, Defendants and GEB told consumers during telephone sales presentations that they could secure for them a loan modification through a government-sponsored program, or otherwise obtain a loan modification that would lower consumers' monthly mortgage payment and reduce their mortgage interest rate, and that in most cases Defendants and GEB would complete the process within three to four months.

24. In numerous instances, Defendants and GEB quoted a specific dollar amount by which they would reduce consumers' monthly mortgage payment, or promised a mortgage interest rate substantially lower than the rate the consumer was currently paying. In some instances, Defendants and GEB represented to consumers that they had a working relationship with the consumer's lender.

25. In numerous instances, Defendants and GEB told consumers, many of whom were current on their mortgage payments, that in order to obtain the promised MARS, consumers had to stop making mortgage payments to their lenders. Defendants and GEB also instructed consumers not to communicate with their lenders during the loan restructure process.

26. In numerous instances, Defendants and GEB told consumers that, if they were unable to obtain the promised loan modification, they would fully refund the fee the consumer paid.

27. Prior to receiving payment from consumers, Defendants and GEB sent consumers a packet of written materials via email, fax, or in some instances, regular mail. The written materials did not include the disclosures required by the MARS Rule. Consumers were told they had to complete the forms in the packet and return the completed forms with the requested financial documents and the agreed upon fee. The materials included: (1) "Clients Rights and Responsibilities," advising the consumer to forward all correspondence from the lender to Defendants and GEB and stating that the process, in most instances, is completed within 90 days after it is assigned to a negotiator; and (2) the "Client Retention Agreement," which stated as follows:

> This is a written agreement ("Agreement") that California law requires attorneys to have with their clients. The offices of AAP Firm & Associates, a Professional Corporation ("AAPC"), (Hereinafter referred to as "Attorney" and/or "Firm" will provide services to [name of consumer] ("Client") set forth below: (sic)
>
> The Firm's responsibility shall be to vigorously protect your property, to resolve the dispute you have with your financial lender, to conduct a loan compliance audit for you as you have directed or will direct against various financial institutions for violating their legal obligations toward you that you represent is evidenced by documents in your files justifying legal action.
>
> Scope of Representation – Such representation to resolve your case shall be limited to the following:
>
> I. Review your loan docs to ensure they comply with all Federal Laws and Regulations.
> II. Force the lender to adjust the current terms, eliminate or reduce any delinquent or missed payments.
> III. Reduction of current loan balance, reduced rate.
> IV. Loan to be converted to a longer term. Fixed Rate.
> V. Reduction of any current or future interest rate changes.
> VI. Update status with credit agencies.
> VII. Negotiate short sale when necessary.
> VIII. Negotiate Deed in Lieu when necessary.

28. Defendants and GEB required and accepted payment of fees ranging between $1000 and $5000 prior to the consumer executing a written agreement with the lender or servicer that incorporated an offer for loan modification. Often, Defendants and GEB permitted consumers to split the advance payment by sending two or more checks. In some instances, Defendants and GEB told consumers that the fee covered the cost of modifying the mortgage or securing a loan restructure.

29. In numerous instances, Defendants and GEB remained in contact with the consumer only until the final payment check had cleared the bank. Thereafter, in numerous instances, when consumers attempted to contact Defendants and GEB for status updates, they often failed to answer or return consumers' telephone calls or emails. When consumers were able to make contact, in numerous instances Defendants and GEB strung consumers along, telling consumers that they were working on the consumer's loan and that things were going well.

30. In late 2014, Defendants and GEB told consumers who tried to contact them that they had sold or transferred the consumer's file to another firm and that they would no longer be dealing with the loan file or that they had done enough work and would not be providing further services. When consumers attempted to contact the new firm, they could not reach anyone, or if they did reach someone, the person could not help them.

31. After consumers had paid the requested advance fees, in numerous instances, Defendants and GEB failed to obtain the promised relief. In many instances, when consumers contacted their lender, they discovered that Defendants and GEB had never contacted their lenders, or taken any steps to initiate modification proceedings.

32. When Defendants and GEB failed to obtain the promised relief, they did not provide refunds to consumers. Consumers who paid Defendants' and GEB's fees have suffered significant economic injury.

**II. Defendants' Deceptive Student Loan Debt Relief Services Scheme**

33. The U.S. Department of Education ("USDOE"), the largest federal lender and holder of legacy student loans, offers three traditional repayment plans to borrowers with federal student loans. These plans give borrowers options to manage their student loan debt and make repayment of student loans more affordable. The USDOE places borrowers automatically into the 10-year fixed payment standard plan, but borrowers may request enrollment in the graduated repayment plan or the extended repayment plan, which is available for loan amounts greater than $30,000. The graduated and extended payment plans have 25-year terms and provide for either graduated or fixed payments. Graduated payments are initially lower, but increase over time in anticipation of increased income. Neither the extended nor graduated payment plans involve an application

process and neither is income-based. A borrower can request either plan with just a phone call or letter.

34. To assist borrowers struggling to make payments under the traditional repayment plans, Congress passed the College Cost Reduction and Access Act of 2007 ("CCRA"). The CCRA established a new income-based repayment ("IBR") plan to help borrowers whose loan balance is equal to or greater than their adjusted gross annual income. This plan allows eligible borrowers who took out federal student loans prior to July 1, 2014, to choose to limit their monthly payments to 15% of their discretionary monthly income. If the borrower makes all regularly scheduled payments, the government will forgive any unpaid loan balances after 25 years. Eligible borrowers who took out loans after July 1, 2014, can choose to limit their monthly payments to 10% of their discretionary monthly income. If any balance remains after making regular payments for 20 years, that amount may be forgiven. However, because most borrowers will realize increased income over the payment period, monthly payment amounts under the IBR program may eventually increase to fully amortizing payments that would pay off the loans prior to reaching eligibility for loan forgiveness. Further, any forgiven debt will likely be imputed as income for tax purposes.

35. The CCRA also established the Public Service Loan Forgiveness Program ("PSLF"). The PSLF allows total or partial debt forgiveness for certain teachers and public service employees. A full-time teacher who works for five consecutive years in a designated low-income elementary or secondary school may have $17,500 of his or her loan amount forgiven. A public service employee may have his or her remaining debt forgiven after making 120 monthly payments under an eligible repayment plan while employed in public service.

36. Eligible borrowers can apply electronically for IBR and PSLF plans through the USDOE's website at www.Studentloans.gov or by mailing a completed paper application to the USDOE or their loan servicer. Neither the USDOE nor the loan servicers charge borrowers any fee to apply for IBR or PSLF, and the application forms are simple, taking only about 30 minutes to complete.

37. Lenders will grant forbearance while processing applications for an alternative repayment plan, and in some cases of hardship. During forbearance, unpaid interest continues to accrue and may be capitalized, increasing the total amount due and in some cases the principal balance as well.

38. From at least June 2014 to February 2016, Defendants and their codefendants in the Prior Action – GEB, SSLH, and SDP ("codefendants") – engaged in a course of conduct to market and sell a program or services to renegotiate, settle, or otherwise alter the terms of payment for student loan debt.

39. Many customers of Defendants and their codefendants were financially distressed borrowers in or at risk of delinquency or default on their federal student loans. Some were already subject to seizure of their tax refunds or wage garnishment. Defendants and their codefendants guaranteed that they would lower consumers' monthly payments and secure debt forgiveness or other debt relief, including the lifting of garnishments and tax liens upon payment of a substantial fee.

40. Defendants and their codefendants represented that if they were unable to secure the promised debt relief they would refund the fees paid by the consumers. In numerous instances, Defendants and their codefendants failed to obtain any relief for consumers or did not provide the promised relief, and did not provide promised refunds.

41. **The Deceptive Sales Pitch**. Defendants and their codefendants marketed their student loan debt relief services primarily via outbound telemarketing calls to consumers and inbound telemarketing calls from consumers responding to their television and Internet advertising. Defendants and their codefendants marketed their services on the Internet through use of the following websites: www.studentloanhelpdirect.com; www.studentloanhd.com; www.selectstudentloanhelp.com; www.selectslhelp.com; www.selectstudentloan.com; www.slhdirect.com; www.selectstudentlh.com; and www.selectdocprep.com.

42. Defendants' and their codefendants' student loan websites claimed, at various times during the relevant time period, the following:

- **SELECT STUDENT LOAN HAS THE BEST STATEGIES TO GET LOWER PAYMENTS ON YOUR STUDENT LOAN DEBT**
- **GARNISHMENT LETTER** If you have received a letter warning you that your student loans are in default and threatening garnishment of your wages, you should contact us a soon as possible.
- **Let us help you to stop the wage garnishment and put you in a new repayment program**.
- **STUDENT LOAN HELP DIRECT WANT A SOLUTION FOR STUDENT DEBT**?
- Want to lower or eliminate your student loan payments? Interested in changing your payment plan? Need one easy way out of debt?
- Do you need RISK FREE solutions? We guarantee our work will get you the lowest monthly payment possible.
- **We Are Here To Help You**: Are you looking for a solution regarding your federal student loans? Your monthly payment could be too much to handle, or you missed a payment, or you have fallen into default and your wages are being garnished. Our friendly and professional staff are waiting to help you. Select Student Loan was created to help you solve these problems and help you to stop struggling with Federal Student Loans.
- Select Student Loan can work with the Department of Education to not only lower your monthly payment but also get you a certain level of forgiveness as well.
- Let us help you to stop the wage garnishment and put you in a new repayment program.

43. In numerous instances, Defendants and their codefendants told consumers during telephone sales presentations that they could renegotiate, settle, or alter the terms of payment for the consumer’s student loan debt if they paid an up-front fee to enroll in their program. Defendants and their codefendants told consumers that they would secure for them a specified lower monthly student loan payment, loan forgiveness, and removal of tax liens and wage garnishments. Defendants and their codefendants told consumers that the ability to secure the promised relief was contingent on the consumer paying a fee to the Defendants.

44. In numerous instances, Defendants and their codefendants guaranteed the promised debt relief, telling consumers that if they were unable to obtain the promised debt relief they would fully refund the advance fee.

45. In numerous instances, Defendants and their codefendants represented to consumers that they were affiliated with or worked directly with the USDOE, the government, or the consumer's loan servicer.

46. Defendants and their codefendants required and received payment of a fee typically ranging from $500 to $800, prior to consumers executing a written agreement with their lender or servicer that incorporates an offer for student loan debt relief. Defendants and their codefendants often allowed consumers to make installment payments of the fee, but told consumers that they would not begin work on consumers' behalf until after they received the full payment.

47. Prior to consumers paying the requested advance fee, Defendants and their codefendants sent consumers documents to sign and return. The documents consisted of an authorization to debit consumers' bank accounts or charge consumers' credit accounts, a client services agreement, and a limited power of attorney. Consumers e-signed the documents and returned them to Defendants and their codefendants. Consumer signatures on the power of attorney forms were not witnessed or notarized. Loan servicers could reject the forms because an electronic signature is an invalid form of signature for this type of instrument, and the forms lacked a notary's acknowledgment.

48. In numerous instances, Defendants and their codefendants posing as the consumer requested forbearance, a temporary reprieve in the requirement to make monthly payments. In numerous instances, Defendants and their codefendants did not tell consumers in advance that they sought forbearance, nor did they disclose to consumers that forbearance resulted in the capitalization of unpaid interest. In some instances, Defendants and their codefendants told consumers that the consumer would not be responsible for the accrued interest. Many consumers accrued thousands of dollars in unpaid interest during forbearance.

49. In numerous instances, Defendants and their codefendants failed to obtain the promised student loan debt relief. In many instances, when consumers contacted their lender, they discovered that Defendants and their codefendants never contacted the lender.

50. In numerous instances, consumers were unable to obtain refunds after Defendants and their codefendants failed to provide the promised student loan debt relief service. Consumers who paid Defendants' and their codefendants' fees suffered significant economic injury, including: paying hundreds of dollars to them and receiving little or no service in return; increased loan balances from capitalized interest; falling behind or further behind on student loan payments; incurring penalties; and even going into delinquency, default, or having their wages garnished.

**COUNT I**
**(Nondischargeable Debt for Money Obtained by False Pretenses, False Representations or Actual Fraud/Deceptive MARS Scheme)**

51. Plaintiff FTC repeats and realleges the allegations in ¶¶ 3-32.

52. In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, or sale of MARS, Defendants represented, directly or indirectly, expressly or by implication:

a. that Defendants and GEB would obtain mortgage loan modifications for consumers that would make their payments substantially more affordable, substantially lower their interest rates, or help them avoid foreclosure;

b. that Defendants and GEB would provide legal services, including negotiating on consumers behalf with lenders; and,

c. that Defendants and GEB would refund consumers' fee if they failed to obtain the promised relief.

53. In truth and in fact, in numerous instances, such representations were false or unsubstantiated at the time the representations were made.

54. Therefore, Defendants' representations or omissions as set forth in ¶ 52 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

55. Defendants' activities set forth in ¶ 52 constitute false pretenses, false representations, or actual fraud. Defendants acted intentionally with knowledge that they were engaged in a fraudulent scheme, and with knowledge of the falsity of the representations and deceptive omissions or with reckless disregard of the truth or falsity of the representations and omissions.

56. Defendants' false representations and deceptive omissions injured consumers, and were material to consumers in the course of deciding to pay for the services offered by Defendants. Consumers' reliance on Defendants' representations and omissions was justifiable.

57. The total amount of money Defendants obtained from consumers by such false pretenses, false representations or actual fraud is included in the $2,329,456 Final Judgment against them in the Prior Action.

58. The portion of the Final Judgment attributable to Defendants' deceptive MARS scheme is a debt for money obtained by false pretenses, false representations or actual fraud, and is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

**COUNT II**

**(Nondischargeable Debt for Money Obtained by False Pretenses, False Representations or Actual Fraud/Material Misrepresentations, Advance Fees, Advising Consumers Not to Communicate with Lender, and Failure to Disclose Materials Facts Regarding MARS)**

59. Plaintiff FTC repeats and realleges the allegations in ¶¶ 3-32.

60. In numerous instances, in the course of providing, offering to provide, or arranging for others to provide MARS, Defendants, in violation of the MARS Rule, 12 C.F.R. § 1015.3(b)(1)-(4), misrepresented, expressly or by implication, material aspects of their services, including, but not limited to:

a. The likelihood that Defendants and their codefendants would obtain mortgage modifications for consumers that would make their payments substantially more affordable;

b. The amount of time it would take Defendants and their codefendants to accomplish any represented service or result;

c. The consumer's obligation to make scheduled periodic payments or any other payments pursuant to the terms of the consumer's dwelling loan;

d. The terms or conditions of refunds, or the circumstances in which a full or partial refund would be granted; and

e. That the consumer would receive legal representation.

61. In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, or sale of MARS, Defendants:

a. asked for or received payment before consumers had executed a written agreement between the consumer and the loan holder that incorporated any offer obtained by Defendants and GEB, in violation of the MARS Rule, 12 C.F.R. § 1015.5(a);

b. represented expressly or by implication, that a consumer could not or should not contact or communicate with his or her lender or servicer, in violation of the MARS Rule, 12 C.F.R. § 1015.3(a); and

c. failed to disclose, or to adequately disclose materials facts, including:

i. In all general commercial communications –

1. "[Name of company] are not associated with the government, and our service is not approved by the government or your lender," in violation of the MARS Rule, 12 C.F.R. § 1015.4(a)(1); and

2. "Even if you accept this offer and use our service, your lender may not agree to change your loan," in violation of the MARS Rule, 12 C.F.R. § 1015.4(a)(2);

ii. In all consumer-specific commercial communications –

1. "You may stop doing business with us at any time. You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer]. If you reject the offer, you do not have to pay us. If you accept the offer, you will have to pay us [insert amount or method for calculating the amount] for our services," in violation of the MARS Rule, 12 C.F.R. § 1015.4(b)(1);

2. "[Name of company] are not associated with the government, and our service is not approved by the government or your lender," in violation of the MARS Rule, 12 C.F.R. § 1015.4(b)(2);

3. "Even if you accept this offer and use our service, your lender may not agree to change your loan," in violation of the MARS Rule, 12 C.F.R. § 1015.4(b)(3); and

4. "If you stop paying your mortgage, you could lose your home and damage your credit," in violation of the MARS Rule, 12 C.F.R. § 1015.4(c).

62. Therefore, Defendants' representations or omissions as set forth in ¶¶ 60-61 constitute deceptive acts or practices in violation of the MARS Rule and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

63. Defendants' activities set forth in ¶¶ 60-61 constitute false pretenses, false representations, or actual fraud. Defendants acted intentionally with knowledge that they were engaged in a fraudulent scheme, and with knowledge of the falsity of the representations and deceptive omissions or with reckless disregard of the truth or falsity of the representations and omissions.

64. Defendants' false representations and deceptive omissions injured consumers, and were material to consumers in the course of deciding to pay for the services offered by Defendants. Consumers' reliance on Defendants' representations and omissions was justifiable.

65. The total amount of money Defendants obtained from consumers by such false pretenses, false representations or actual fraud is included in the $2,329,456 Final Judgment against them in the Prior Action.

66. The portion of the Final Judgment attributable to Defendants' deceptive MARS scheme is a debt for money obtained by false pretenses, false representations or actual fraud, and is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

**COUNT III**

**(Nondischargeable Debt for Money Obtained by False Pretenses, False Representations or Actual Fraud/Deceptive Student Loan Debt Relief Services Representations)**

67. Plaintiff FTC repeats and realleges the allegations in ¶¶ 3-13, and 33-50.

68. In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, or sale of student loan debt relief services, Defendants represented, directly or indirectly, expressly or by implication:

a. that Defendants and their codefendants would renegotiate, settle, or alter the terms of payment for consumers' student loan debts to secure a specified lower monthly loan payment, loan forgiveness, and removal of tax liens and wage garnishments;

b. that the promised debt relief was guaranteed and if Defendants and their codefendants were unable to secure the promised debt relief they would fully refund consumers' fees;

c. that consumers could only obtain the promised relief by paying Defendants' and their codefendants' advance fee;

d. that Defendants and their codefendants were affiliated with or worked directly with the USDOE, the government, or consumers' loan servicer; and

e. that consumers would not be responsible for the interest that accrues during forbearance.

69. In truth and in fact, in numerous instances, such representations were false or unsubstantiated at the time the representations were made.

70. Therefore, Defendants' representations or omissions as set forth in ¶ 68 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the TSR.

71. Defendants' activities set forth in ¶ 68 constitute false pretenses, false representations, or actual fraud. Defendants acted intentionally with knowledge that they were engaged in a fraudulent scheme, and with knowledge of falsity of the representations and deceptive omissions or with reckless disregard of the truth or falsity of the representations and omissions.

72. Defendants' false representations and deceptive omissions injured consumers, and were material to consumers in the course of deciding to pay for the services offered by Defendants. Consumers' reliance on Defendants' representations and omissions was justifiable.

73. The total amount of money Defendants obtained from consumers by such false pretenses, false representations or actual fraud is included in the $2,329,456 Final Judgment against them in the Prior Action.

74. The portion of the Final Judgment attributable to Defendants' deceptive student loan debt relief services scheme is a debt for money obtained by false pretenses, false representations or actual fraud, and is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

**COUNT IV**
**( (Nondischargeable Debt for Money Obtained by False Pretenses, False Representations or Actual Fraud/Misrepresentations, Advance Fees, and Failure to Disclose Material Facts Regarding Student Loan Debt Relief Services)**

75. Plaintiff FTC repeats and realleges the allegations in ¶¶ 3-13, and 33-50.

76. In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, or sale of student loan debt relief services, Defendants misrepresented, directly or indirectly, expressly or by implication, material aspects of their debt relief services, in violation of the TSR, 16 C.F.R. § 310.3(a)(2)(vii) and (x), including but not limited to:

a. that Defendants and their codefendants would renegotiate, settle, or alter the terms of payment of consumers' student loan debts to secure a specified lower monthly loan payment, loan forgiveness, and removal of tax liens and wage garnishments;

b. that the promised debt relief was guaranteed and if Defendants and their codefendants were unable to secure the promised debt relief they will fully refund consumers' fees;

c. that consumers could only obtain the promised relief by paying Defendants and their codefendants' advance fee;

d. that Defendants and their codefendants were affiliated with or worked directly with the USDOE, the government, or consumers' loan servicer; and

e. that consumers would not be responsible for interest that accrued during forbearance.

77. In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, or sale of student loan debt relief services, Defendants:

a. requested or received payment of a fee or consideration for debt relief services before they have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (b) the customer has made at least one payment pursuant to that agreement, in violation of the TSR, 16 C.F.R. § 310.4(a)(5)(i);

b. failed to disclose or disclose adequately the material facts, before a consumer agreed to pay for Defendants and their codefendants' student loan debt relief services, that to the extent the debt relief service relied on or resulted in the customer's failure to make timely payments to creditors or debt collectors, the debt relief service could increase the amount of money the customer owed due to accrual of fees and interest, in violation of the TSR, 16 C.F.R. § 310.3(a)(1)(viii)(C).

78. Therefore, Defendants' representations or omissions as set forth in ¶¶ 76-77 constitute deceptive acts or practices in violation of the TSR and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

79. Defendants' activities set forth in ¶¶ 76-77 constitute false pretenses, false representations, or actual fraud. Defendants acted intentionally with knowledge that they were engaged in a fraudulent scheme, and with knowledge of falsity of the representations and deceptive omissions or with reckless disregard of the truth or falsity of the representations and omissions.

80. Defendants' false representations and deceptive omissions injured consumers, and were material to consumers in the course of deciding to pay for the services offered by Defendants. Consumers' reliance on Defendants' representations and omissions was justifiable.

81. The total amount of money Defendants obtained from consumers by such false pretenses, false representations or actual fraud is included in the $2,329,456 Final Judgment against them in the Prior Action.

82. The portion of the Final Judgment attributable to Defendants' deceptive student loan debt relief services scheme is a debt for money obtained by false pretenses, false representations or actual fraud, and is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

WHEREFORE, Plaintiff FTC requests that the Court:

(a) Determine that the Final Judgment against Defendants Eric West and Kay West in the Prior Action of $ $2,329,456 is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A); and

(b) Grant the FTC such other and further relief as this case may require and the Court deems just and proper.

Dated: December 24, 2018

_/s/ Michael P. Mora________________

Michael P. Mora (Ill. Bar No. 6199875)
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, D.C. 20580
Telephone: (202) 326-3373
Facsimile: (202) 326-3197
E-Mail: mmora@ftc.gov